UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BARRY BIXBY,

    Plaintiff,

    v.                                                                                       CIVIL ACTION NO. 23-10334-MPK[1]

THE TOWN OF REHOBOTH and
CHIEF JAMES J. TROMBETTA,

    Defendants.

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT (#68)

KELLEY, U.S.M.J.

I. Introduction

    In this civil rights action under 42 U.S.C. § 1983, plaintiff Barry Bixby sues the Town of Rehoboth, Massachusetts ("the Town") and James J. Trombetta, Chief of the Rehoboth Police Department ("Chief Trombetta"), seeking damages for what he claims was the unlawful abuse of police power carried out in retaliation for his comments at a town hearing, in violation of his constitutional rights.  The Town and Chief Trombetta have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint.  (#68.)  Bixby opposes.  (#78.)

    Defendants' Motion to Dismiss (#68) is allowed in part and denied in part.  The court finds that the Amended Complaint adequately states a claim against Chief Trombetta but not against the Town.

---

[1] With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).  (#87.)

1

II. Background

   A. Procedural History

In February 2023, Barry Bixby, together with Barry Bixby Automotive LLC d/b/a European Motor Cars, brought suit against the Town and Chief Trombetta, in addition to the Town of Rehoboth Board of Selectmen, Frederick Vadnais, Jr., Michael Deignan, George Solas, Leonard Mills, Jr., Robert Johnson, the Town of Rehoboth Police Department ("the Municipal Defendants"), and Anthony A. Oliveira ("Oliveira"). (#1.)

On March 22, 2024, Magistrate Judge Dein, to whom this matter was originally assigned, issued a Memorandum and Order, granting a motion to dismiss filed by the Municipal Defendants (#50) without prejudice, and so permitting Bixby to seek leave to file an amended complaint.[2] (#62 at 31.) Bixby's Motion for Leave to File an Amended Complaint (#63) was allowed on April 18, 2024. (#64.)

In the Amended Complaint, Bixby pared down his original claims, designating himself as the sole plaintiff and asserting a single count against the Town and Chief Trombetta under § 1983. (#65 at 1, 12.) In August 2024, the case was reassigned (##84, 85), and the parties consented to the jurisdiction of this court. (#87.)

   B. Relevant Facts

The facts below are taken from the Amended Complaint.

   1. Bixby's Class II Auto License Application and the Board of Selectmen Hearings

In August 2021, Barry Bixby, a resident of Portsmouth, Rhode Island, submitted an application for a Class II Auto License to Buy, Sell, Exchange or Assemble Second Hand Motor

---

[2] That Order also allowed, with prejudice, the anti-SLAPP motion to dismiss (#25) filed by Oliveira and denied his partial motion to dismiss (#27) as moot. (#62 at 31.) Oliveira moved pursuant to Fed. R. Civ. P. 54(b), for the entry of separate and final judgment; Judge Dein allowed the motion and entered judgment in his favor on all counts of the original complaint. (##66, 83.)

Vehicles or Parts Thereof ("the Application") with the Town of Rehoboth, Massachusetts. (#65 ¶¶ 1-2, 8.) The Application, which Bixby maintains "complie[d] with all relevant laws and ordinances[,]" designated 74 Fall River Avenue in Rehoboth as the address for a proposed automotive dealership. *Id.* ¶¶ 9, 31.

The issue of the Class II Auto License's approval was marked for public hearing on October 18, 2021, before the Rehoboth Board of Selectmen (the "Board"). *Id.* ¶ 10. At that hearing, Anthony Oliveira, Bixby's former business partner, criticized Bixby's character and his prior business dealings. The public hearing was continued to October 25, 2021, and later to November 1, 2021, to allow the Rehoboth Police Department time to complete an investigation requested by the Board. *Id.* ¶¶ 11-12, 15-17.

At the November 1, 2021 hearing, an officer of the Rehoboth Police Department presented the department's investigative findings that "nothing illegal had occurred" and that the dispute involving Bixby and his former business partner was "essentially a business issue[.]" *Id.* ¶¶ 21-22. In his closing statement at the hearing, Bixby, now represented by counsel, drew the Board's attention to the more than fifteen letters of recommendation which had been submitted on his behalf. *Id.* ¶¶ 18, 23-24. Two selectmen, however, questioned the authenticity of those letters and allegedly accused Bixby's counsel "of creating fake email addresses" in order to submit the letters. *Id.* ¶ 25.

2. The Trombetta Letter and the Public Records Requests

One of the letters of recommendation was authored by Chief Trombetta. *Id.* ¶ 27. In the letter, Chief Trombetta wrote:

> I have known Mr. Bixby of [ ] Rd., Portsmouth, RI personally for many years. I can attest that he has the character, diligence, and passion for cars and customer service that will make him an asset to the business community in Rehoboth.

3

*Id.* When the Board asked him about the letter, Chief Trombetta "downplayed [its] veracity" and admitted that he had not in fact known Bixby before July 28, 2021, the date he interviewed Bixby in his office, and he acknowledged that these kinds of letters were prepared by his administrative assistant for all license applicants. *Id.* ¶ 28. Following this questioning, four selectmen voted to deny Bixby's Application. *Id.* ¶ 29.

A little over a week later, around November 10, 2021, Bixby filed an appeal in the Massachusetts Superior Court pursuant to Mass. Gen. Laws. ch. 140, § 59,³ and also filed public records requests with the Town. *Id.* ¶¶ 32-33. As a result of these requests, the Town produced records related to other Class II Auto License applications, including hearing records, application materials, and past letters of recommendation from Chief Trombetta. *Id.* ¶ 37.

As Bixby alleges, Chief Trombetta's earlier testimony at the November 1, 2021 hearing "about not knowing" him "was proven false by these documents[,]" as they revealed that it was Chief Trombetta's practice, when he "d[id] not actually know an applicant[,]" to produce a different letter than the one Bixby received—thus contradicting Chief Trombetta's earlier statements. *Id.* ¶ 38. The records also revealed that the Board was holding Bixby's application to a higher standard than applications for Class II Auto Licenses which had been granted in the past. *Id.* ¶ 39.

   3. <u>The Remand Hearing and the Incident on Route 44</u>

Over a year later, on January 9, 2023, the Board held a remand hearing. *Id.* ¶¶ 40, 42, 45. As Bixby alleges, one of the issues at the hearing related to Trombetta's statements at prior

---

³ Though the court has not considered it in evaluating defendants' motion to dismiss, it notes that Bixby has attached as Exhibit A (#78-1) to his Opposition, a June 24, 2024 Memorandum of Decision and Order issued by a justice of the Superior Court which remanded the issue of deciding the Application to the Board with the order that it "issue a new decision that complies fully with G. L. c. 140, § 59[.]" (#78-1 at 9).

hearings about his letter of recommendation, statements "which were provably false and perjurious" based on public records Bixby had received from the Town. *Id.* ¶ 53. On hearing these comments, Bixby alleges that Trombetta "immediately became animated and agitated, and blanketly refused to answer any questions posed by [Bixby's] counsel" or say anything at the hearing. *Id.* ¶ 54. When the Board decided to question Bixby about his business activities, his counsel "broke up the line of questioning" because he had had enough of "the Board's fishing expedition" and their "dog-and-pony-show hearing[.]" *Id.* ¶¶ 55-56. Two selectmen voted to deny the Application, but three voted against denial. *Id.* ¶ 57. The Board decided to continue the hearing to February 13, 2023. *Id.* ¶ 58.

As the meeting adjourned, Bixby alleges that Chief Trombetta "was the first to leave the building" and "spe[d] out of the parking lot in his police cruiser." *Id.* ¶ 59. Bixby and his counsel left the meeting about fifteen minutes later and drove on Route 44 toward Rhode Island, in separate vehicles and at a rate of speed below the legal limit. *Id.* ¶¶ 60, 62-63.

At 8:44 p.m., when he had traveled less than a fourth of a mile down Route 44, Bixby saw flashing lights behind him and was pulled over by an officer of the Rehoboth Police. *Id.* ¶ 64. Seeing what had just occurred, Bixby's counsel called him and instructed him to leave the call open, with his phone on the car's console, "so that the interaction could be heard." *Id.* Meanwhile, counsel, who was roughly a tenth of a mile ahead of Bixby, continued down Route 44 and noticed two more Rehoboth Police cruisers stationed alongside the road. *Id.* ¶ 65. When the officer who had stopped Bixby approached Bixby's car, he told Bixby that his license plates were "cancelled." *Id.* ¶¶ 61, 66. After returning to his cruiser to "r[u]n the plates again, allegedly," the officer "remarked they were all set" and allowed Bixby to leave. *Id.*

As alleged in the Amended Complaint, the Rehoboth Police dispatch log revealed that there were three patrol officers, one shift supervisor, and two other officers on duty that night. *Id.* ¶¶ 67-69, 72. The three patrol officers were each assigned to a different "patrol sector." *Id.* ¶¶ 70-71. Bixby claims that "[t]here is no indication in the dispatch log of how, why, when, or at whose direction" the three patrol officers were positioned that night, and he maintains that because the Town covers 46.76 square miles, there could be "no legitimate reason other than wild coincidence" that the three patrol officers, each assigned to a different sector, were located "on the one main road out of Rehoboth back to Rhode Island[,]" within "less than a mile of each other, during their eight-hour shifts, at the same time that [he] was pulled over, and less than 45 minutes after the January 9th hearing closed." *Id.* ¶¶ 73-76, 84.

Bixby further alleges that dispatch log records for that night do not document his traffic stop: there was no record of the stop, of the officer having called dispatch about it, or of Bixby's plates having been run. *Id.* ¶¶ 78-79, 83. The records did, however, document a stop "identical to Bixby's" performed later that night at 9:35 p.m. by Officer Mendes, one of the three patrol officers. *Id.* ¶¶ 71, 80. According to these records, a white van was stopped and its license plates were run through the dispatcher's computer system. *Id.* ¶¶ 80, 81. Two days after the stop of the white van, Officer Mendes sent a letter to Chief Trombetta in which he explained that the van's stop had been the result of his "erroneously running commercial plates for the van, as opposed to the dealer plates the van was displaying at the time of the stop." *Id.* ¶ 82. No such letter explaining the stop of Bixby's vehicle exists. *Id.* ¶ 83.

Bixby alleges that Chief Trombetta, "in retaliation for being accused of dishonesty and perjury in the open public meeting by Bixby's counsel[,]" positioned these three patrol officers using his cell phone and ordered them to stop Bixby in "an unlawful abuse of police power" and

6

"show of force" designed to intimidate Bixby and discourage him "from pursuing [his] legal rights, remedies and protections[.]" *Id.* ¶¶ 77, 85-86.

III. Legal Standard

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In assessing a motion to dismiss under Rule 12(b)(6), the court employs a two-step process, in which it first "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (additional citation omitted).  It then "take[s] the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor," to "see if they plausibly narrate a claim for relief." *Id.*  A complaint's "'[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]'" *Pitta v. Medeiros,* 90 F.4th 11, 17 (1st Cir. 2024) (quoting *Twombly*, 550 U.S. at 555) (first alteration in original).

IV. Discussion

A. Count I – 42 U.S.C. § 1983 – Defendant Town and Defendant Trombetta

The gist of Bixby's claim is that Chief Trombetta, in retaliation for Bixby's exercise "of his rights of petition and free speech" at the hearing on January 9, 2023, ordered an officer of the Rehoboth Police to perform a traffic stop that was "unsupported by reasonable suspicion or probable cause" in violation of the First and Fourth Amendments to the United States

Constitution.[4]  (#65 ¶¶ 95-96.)  Defendants argue that the Amended Complaint's allegations, like the original complaint's,[5] fail to state a claim.  (#69 at 9-10.)

Section 1983 creates a private right of action against any person who, under color of state law, "subjects, or causes to be subjected, any . . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  42 U.S.C. § 1983.  A claim under § 1983 has two elements: "1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States."  *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999) (additional citation omitted).  The parties do not dispute that the conduct alleged here was committed under color of state law, so the court focuses on whether Bixby has adequately pled a constitutional violation.

1. Section 1983 - Fourth Amendment Violation

Bixby claims that the traffic stop he experienced "was unreasonable as it was unsupported by reasonable suspicion or probable cause, and only occurred as a direct result of the command issued by Defendant Trombetta, in violation of the Fourth Amendment[.]"  (#65 ¶ 95.)  Bixby has not named the officer who made the stop as a defendant in this case; instead, he

---

[4] In Count I, Bixby also appears to assert a claim under "Article XVI of the Part of the First of the Constitution of the Commonwealth of Massachusetts."  (#65 ¶ 97.)  Bixby does not bring this claim under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I, as he must, and he does not reference the MCRA in his complaint.  For this reason, the court dismisses any such claim.  *See Orell v. UMass Mem. Med. Ctr.*, 203 F. Supp. 2d 52, 71 (D. Mass. 2002) (dismissing claim brought directly under Article XVI, and not the MCRA) (additional citations omitted).

[5] In his original complaint, Bixby did not allege a § 1983 claim in connection with the stop on Route 44.  Instead, he asserted a count of "Abuse of Police Power – Unlawful Detention" against Chief Trombetta and the Rehoboth Police Department, the Town's instrumentality.  (#1 ¶¶ 108-11.)  Judge Dein dismissed this count "[i]n the absence of any clarity as to the cause of action being asserted."  (#62 at 25.)

brings suit against Chief Trombetta and argues that the allegations of the Amended Complaint "support[] a respondeat superior theory of liability against [him]." (#78 at 3.)

Although "a supervisor cannot be held liable under § 1983 on a respondeat superior theory[,]" *Justiniano v. Walker,* 986 F.3d 11, 21 (1st Cir. 2021) (additional citation omitted), "supervisory officials may be liable on the basis of their own acts or omissions." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (additional citation omitted). The First Circuit has explained:

> In the context of Section 1983 actions, supervisory liability typically arises in one of two ways: either the supervisor may be a 'primary violator or direct participant in the rights-violating incident,' or liability may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'. . . In either case, the plaintiff in a Section 1983 action must show 'an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization,' between the actor and the underlying violation.

*Id.* (internal citation omitted). The requirement that there be "an 'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'" *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (additional citation omitted).

     a. Underlying Constitutional Violation

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Because, under the Fourth Amendment, "a traffic stop constitutes a seizure of both the stopped vehicle and its occupants . . . a traffic stop must satisfy a standard of objective reasonableness." *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014) (citing *Terry v. Ohio*, 392 U.S. 1, 19 (1968)) (additional citation omitted). "A traffic stop is

constitutional if an officer has a reasonable suspicion of unlawful conduct involving a motor vehicle or its operation," such as a traffic violation or infraction. *United States v. Jenkins*, 680 F.3d 101, 104 (1st Cir. 2012) (additional citation omitted); *see Kenney v. Floyd*, 700 F.3d 604, 608 (1st Cir. 2012).

For a stop to be reasonable, it must be "justified at its inception" by reasonable suspicion. *United States v. Mouscardy*, 722 F.3d 68, 73 (1st Cir. 2013) (additional citation omitted). "Reasonable suspicion is a less exacting requirement than probable cause, but requires something more than an inchoate and unparticularized suspicion or hunch." *United States v. Tiru-Plaza,* 766 F.3d 111, 116 (1st Cir. 2014) (additional citations and quotations omitted). In evaluating whether reasonable suspicion exists, the court applies "an objective standard, rather than assessing the subjective intent of an individual officer," and considers the "'totality of the surrounding circumstances.'" *Id.* (quoting *United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008)).

Bixby alleges that when he was pulled over on Route 44, the officer who initiated the traffic stop "indicated that his license plates were 'cancelled.'" (#65 ¶ 66.) The officer "returned to his cruiser, ran the plates again, allegedly," and allowed Bixby to leave after remarking that the plates "were all set[.]" *Id.* Bixby does not allege that any other basis for the stop was given.

Defendants argue that the Amended Complaint's allegations provide a "basis for the officer's suspicion and justification for the initial stop[.]" (#69 at 11-12.) As they point out, under Massachusetts law, "driving a motor vehicle with an [e]xpired or [r]evoke[d] [r]egistration is considered a misdemeanor criminal offense[.]" *Id.* at 11. Any officer who suspected that Bixby's license plates were "cancelled," however, would only have arrived at that conclusion, and formed the reasonable suspicion necessary to stop Bixby, by first checking motor vehicle

registration records or receiving confirmation through some other source. *See Kansas v. Glover*, 589 U.S. 376, 385 (2020) (after running a vehicle's license plate number through a database and learning that its registered owner had a revoked driver's license, officer's commonsense inference that defendant was the likely driver of the vehicle was sufficient to form reasonable suspicion to initiate stop). Here, while dispatch log records documented the duration and "date/time/location and plate number r[u]n" of the white van stopped later that night under similar circumstances by the same officer,[6] Bixby alleges that there are no records showing that the plate of his car was run or even that he was stopped. (#65 ¶ 81.) These allegations support the reasonable inference that his license plates were never run and that the officer who stopped Bixby did not have reasonable suspicion to do so.

     b. <u>Affirmative Link</u>

Bixby alleges that Chief Trombetta, using his cell phone and without reasonable suspicion, "commanded his officers to be present on Route 44 and to stop [Bixby] on his way home from the hearing." (#65 ¶ 91.) The First Circuit has cautioned that when alleging supervisory liability, "it is not enough to state that a defendant 'was the officer in charge during the incident'" or "that he 'participated in or directed the constitutional violations' alleged." *Soto-Torres v. Fraticelli*, 654 F.3d 153, 159 (1st Cir. 2011) (where plaintiff brought § 1983 suit on a theory of supervisory liability, allegations in complaint were insufficient where there were no facts to support the supervisor's participation in, or direction of, plaintiff's detention). Here, however, the Amended Complaint's factual allegations go beyond rote accusations.

As set out above, Bixby alleges that when he was stopped, the three patrol officers who were assigned to three different "sectors" in Rehoboth that night were observed "less than half a

---

[6] Although the Amended Complaint does not actually specify which officer stopped Bixby, the parties appear to agree in their briefs that it was Officer Mendes who stopped him. (#69 at 6, 10-11; #78 at 3.)

mile apart from each other[,]" positioned along Route 44 "less than 45 minutes after the January 9th hearing closed." (#65 ¶¶ 71-75.) Bixby further alleges that there is "no indication in the dispatch log of how, why, when, or at whose direction the three patrol officers were all located[.]" *Id.* ¶ 76. These allegations, together with the allegation that there is no record of Bixby's traffic stop or his plates having been run, and no supplemental letter explaining the basis for the stop, make the existence of an "affirmative link" between Chief Trombetta and the unreasonable traffic stop plausible. Although subsequent discovery may prove otherwise, at this early stage of the case, Bixby has plausibly alleged that Chief Trombetta positioned the three patrol officers in tight proximity to one another along the only road out of Rehoboth to Rhode Island, in retaliation for Bixby's comments at the hearing, so that Bixby could be stopped when he was driving home.

2. <u>Section 1983 - First Amendment Violation</u>

Bixby also bases his § 1983 claim on a violation of the First Amendment. He states in his Amended Complaint that Chief Trombetta "ordered the traffic stop in retaliation for [Bixby's] protected exercise of his rights of petition and free speech in direct violation of the First Amendment[.]" (#65 ¶ 96.) Defendants do not address this claim in their motion.

The First Amendment guarantees "freedom from official retaliation on the basis of protected speech." *Mattei v. Dunbar*, 217 F. Supp. 3d 367, 373 (D. Mass. 2016) (additional citation omitted). To state a First Amendment retaliation claim, a plaintiff "must allege that (1) [he] engaged in constitutionally protected conduct, (2) [he was] subjected to an adverse action by [defendant], and (3) the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023) (additional citations and quotations omitted) (second alteration in original).

12

Bixby's comments at the hearing on January 9, 2023, in which he criticized Chief Trombetta, were constitutionally protected. *See Maloy v. Ballori-Lage,* 744 F.3d 250, 252 (1st Cir. 2014) (plaintiff's comments at meetings with government officials, along with her public, vehement testimony concerning the alleged corruption of a government board that later denied her a professional license, were constitutionally protected and supported her retaliation claim). The definition of what constitutes adverse action "'is not static across contexts[,]'" *Grossman v. Martin*, 566 F. Supp. 3d 136, 145 (D.R.I. 2021) (additional citation omitted), although as one court suggested in a civil rights suit alleging police misconduct, it "need only be more than '*de minimis*,' which the First Circuit has defined simply as sufficient to chill a 'reasonably hardy' person, or 'a person of ordinary firmness,' from continuing to exercise their constitutional rights." *Huffman v. City of Boston*, Case No. 21-cv-10986-ADB, 2022 WL 2308937, at *4 (D. Mass. June 27, 2022) (quoting *Barton v. Clancy,* 632 F.3d 9, 29 (1st Cir. 2011)) (additional citation omitted). Chief Trombetta's alleged actions in subjecting Bixby to the traffic stop here fit within that description. *See Maddison v. City of Northampton,* 533 F. Supp. 3d 39, 43-44 (D. Mass. 2021) (plaintiff sufficiently stated First Amendment retaliation claim where complaint alleged that officer pulled him over "on possibly pretextual reasons" after he had reported a concern about police conduct towards him); *see also Reid v. Brodeur*, No. Civ. 96-492-B, 2001 WL 274843, at *6 (D.N.H. Feb. 14, 2001) (allowing retaliation claim to proceed against supervisory defendants alleged to have directed their subordinates to carry out retaliatory, unconstitutional acts against plaintiff, where there was a link between their direction and the acts carried out).

With respect to the third and final element, courts have observed that "'[c]lose' temporal proximity between a plaintiff's protected activity and the state's retaliatory conduct can 'raise an

inference of causation.'" *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 226 (1st Cir. 2015) (additional citation omitted). This element "can be satisfied by circumstantial evidence that the constitutionally protected conduct was the driving factor that caused the retaliation[.]" *Huffman*, 2022 WL 2308937, at *5 (denying motion to dismiss First Amendment retaliation claim where "the chronology of events, the location of each incident, and all other surrounding circumstances, plainly allow[ed] for a reasonable inference" of retaliatory motive) (additional citation omitted). Given Chief Trombetta's alleged behavior at the hearing and the sequence of events that followed, one may reasonably infer that Bixby's comments were "a substantial or motivating factor" behind the traffic stop directed by Chief Trombetta. *Gattineri*, 58 F.4th at 514; *see Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (causation may be inferred from "unusually suggestive" timing).

In sum, the allegations in the Amended Complaint, viewed in the light most favorable to Bixby, state a plausible § 1983 claim against Chief Trombetta under both a First Amendment retaliation theory and a theory of unreasonable seizure under the Fourth Amendment.

    3. Qualified Immunity

Defendants argue that Chief Trombetta is entitled to qualified immunity. (#69 at 16.) Qualified immunity provides public officials with "'an immunity from suit rather than a mere defense to liability.'" *Penate v. Hanchett*, 944 F.3d 358, 365 (1st Cir. 2019) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). Its applicability is determined through a two-part test which asks: "'(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation.'" *Id.* at 366 (quoting *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 8 (1st Cir. 2013)) (additional citation and quotations omitted). The second step of this

inquiry has its own two elements: the first "'focuses on the clarity of the law at the time of the violation'" while the second "'focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights.'" *Id.* (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)).  A right is clearly established "if it was 'sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.'" *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 39 (1st Cir. 2024) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (alteration in original).

      a. <u>Section 1983 - First Amendment Violation</u>

As discussed above, Bixby has sufficiently alleged a violation of his First Amendment rights.  On January 9, 2023, the date of the traffic stop, it was clearly established that subjecting a person to retaliatory actions for engaging in protected speech violated that person's First Amendment rights.  *See Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) ("If an official takes adverse action against someone based on [a retaliatory] motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim.") (quoting *Hartman* v. *Moore*, 547 U.S. 250, 256 (2006)) (additional citations omitted).  Any reasonable official in Chief Trombetta's position would have known that subjecting Bixby to the traffic stop, in retaliation for his protected speech at the remand hearing, violated Bixby's First Amendment rights.

      b. <u>Section 1983 - Fourth Amendment Violation</u>

Bixby has also sufficiently alleged, under a theory of supervisory liability, a violation of his Fourth Amendment rights.  In this context, however, the second aspect of the qualified immunity inquiry is "refined further" in that:

15

> [t]he 'clearly established' inquiry as to supervisors is bifurcated and is satisfied only when '(1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context.' . . . If the constitutional right and the availability of supervisory liability that underlie a plaintiff's § 1983 claim are both clearly established, the qualified immunity analysis 'reduces to the test of objective legal reasonableness.'

*Penate*, 944 F.3d at 366 (quoting *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998)).

### i. Clearly Established as to the Subordinate

By January 9, 2023, it was beyond debate that a traffic stop made without reasonable suspicion violated the Fourth Amendment. *See Eldredge v. Town of Falmouth*, 662 F.3d 100, 106 (1st Cir. 2011) (collecting cases). Although, in this context, qualified immunity may exist "'so long as the presence of [reasonable suspicion] is at least arguable[,]'" the circumstances of Bixby's traffic stop, as they have been alleged in the Amended Complaint, do not leave any room for argument. *Id.* (quoting *McInnis v. Maine*, 638 F.3d 18, 22 (1st Cir. 2011)) (additional citation omitted) (alteration in original).

### ii. Clearly Established as to the Supervisor

For a right to be clearly established, there "need not be a prior case directly on point, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Mattei,* 217 F. Supp. 3d at 378 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)). This requirement may be satisfied "by citing controlling caselaw – or a consensus of persuasive caselaw – finding a violation in a factually *similar* situation that places [the] right beyond debate" or by identifying "a 'general' standard 'already identified in the decisional law' that 'appl[ies] with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful[.]'" *Berge*, 107 F.4th at 39 (quoting *Hope v.*

16

*Pelzer*, 536 U.S. 730, 741 (2002)) (additional citations and quotations omitted) (emphasis, and all but first and last alterations, in original).

At the time of Bixby's stop, it was clearly established that a supervisor would be liable for directing a subordinate to perform an investigative stop unsupported by reasonable suspicion. *See, e.g., Chavez v. United States*, 683 F.3d 1102, 1112 (9th Cir. 2012) (qualified immunity did not shield supervisory defendant from § 1983 claim based on Fourth Amendment violations, where plaintiffs plausibly alleged that defendant stopped them without reasonable suspicion and that he "directly participated in the alleged underlying violations"); *Poolaw v. Marcantel*, 565 F.3d 721, 736-38 & n.14, 16 (10th Cir. 2009) (denying summary judgment and qualified immunity with respect to § 1983 supervisory liability claim where there "was no reasonable suspicion to support [supervisory defendant's] decision to order the [traffic] stop at its outset," where his actions "directly led to the constitutional violation[,]" and where he "violated [plaintiff's] clearly established Fourth Amendment rights."); *see also Stillwagon v. City of Del., Ohio,* 747 F. App'x 361, 374-75 (6th Cir. 2018) (denying, in the Fourth Amendment malicious prosecution context, summary judgment and qualified immunity with respect to § 1983 supervisory liability based on claim that police sergeant unlawfully "ordered [an officer] to direct [another officer] to file [a] criminal complaint against" plaintiff); *Hernandez-Zorrilla v. Rossello-Nevares*, Civ. No. 19-1397 (SCC), 2021 WL 1931956, at *5 (D.P.R. May 12, 2021) (denying qualified immunity to supervisors who allegedly "gave unlawful orders to [] subordinates" to organize an incident which led to the alleged constitutional violations, and allowing § 1983 supervisory liability claim alleging Fourth Amendment excessive force violations to proceed).

17

Any reasonable official acting from Chief Trombetta's perspective would have understood that ordering the stop of Bixby, without reasonable suspicion, violated Bixby's Fourth Amendment rights. Chief Trombetta may raise this defense again later in the proceedings against a fuller record, but at this early stage of the case, the court finds that he is not entitled to qualified immunity.

Defendants' motion to dismiss the § 1983 claim against Chief Trombetta is denied.

B. The *Monell* Claim Against the Town

Bixby appears to bring a claim against the Town under *Monell v. Dep't of Soc. Services of the City of New York,* 436 U.S. 658 (1978) in ¶¶ 98-99 of his Amended Complaint. He alleges that the Town "has an established pattern or practice of turning a blind eye and/or tacitly endorsing senior police officers abuse of their law enforcement powers[,]" and that the Town "failed to adopt clear policies" and "properly train its officers . . . on the scope and limitation of their authority regarding traffic stops, reasonable suspicion, and a private citizens' rights to petition and free speech."  (#65 ¶¶ 98-99.)

Under *Monell*, a municipality "'may be liable under [section 1983] if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.'"  *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)) (additional citation and quotations omitted) (alteration in original). A plaintiff who brings such a claim must demonstrate that, "through its *deliberate* conduct, the municipality was the moving force behind the injury alleged" and must "identify a municipal policy or custom that caused [his] injury."  *Id.* (additional citations and quotations omitted) (emphasis in original).

Defendants challenge Bixby's *Monell* claim, contending that he "has only conclusor[ily] alleged [its] components" and "has wholly failed to make any factual allegations" to support it. (#69 at 11.) To the extent Bixby grounds his *Monell* claim in the alleged misconduct of Chief Trombetta, it is well-established that "[e]vidence of a single incident of a constitutional deprivation 'is insufficient, in and of itself, to establish a municipal custom or usage within the meaning of *Monell*.'" *Huffman*, 2022 WL 2308937, at *6 (quoting *Mahan v. Plymouth Cnty. House of Corrs.*, 64 F.3d 14, 16-17 (1st Cir. 1995)) (additional quotations omitted). The court agrees with defendants that beyond the incident involving Chief Trombetta, the generic allegations in ¶¶ 98-99 of the Amended Complaint do not adequately specify any policy or custom behind the alleged violations. (#69 at 14.)

Bixby concedes in his opposition that "there is no policy of the [Town] that is being pointed to at this juncture" but nevertheless claims that the Town engaged in a practice of "allowing senior police officers to abuse their law enforcement powers" by "either conduct[ing] a tail themselves or utiliz[ing] the services of an outside individual to tail [Bixby's vehicle] to Rhode Island" during the course of the Application hearings before the Board. (#78 at 5-6.) Bixby suggests that the details of this "tail" are "set forth in the Amended Complaint," *see id.* at 6, but in fact, they are not. "[A]n opposition to a motion to dismiss is not the place for new factual allegations." *Shea v. Unum Life Ins. Co. of Am.*, Case No. 24-cv-10402-ADB, 2024 WL 4593525, at *4 (D. Mass. Oct. 28, 2024) (collecting cases); *see Decoulos v. Town of Aquinnah,* Case No. 17-cv-11532-ADB, 2018 WL 3553351, at *12 (D. Mass. July 24, 2018) ("[Plaintiff] cannot bolster the allegations of the Amended Complaint through the late addition of new facts in opposing a motion to dismiss.") (additional citations omitted).

The *Monell* claim is dismissed. *See Del Rosario v. Nashoba Reg'l Sch. Dist.*, 502 F. Supp. 3d 623, 636 (D. Mass. 2020); *see also Wood v. City of Haverhill,* Case No. 1:23-cv-12377-JEK, 2024 WL 4189932, at *11 (D. Mass. Sept. 13, 2024).

V. Conclusion

For the above reasons, Defendants' Motion to Dismiss (#68) is allowed in part and denied in part.

December 4, 2024                                     /s/ M. Page Kelley
                                                     M. Page Kelley
                                                     United States Magistrate Judge